UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| UNITED STATES SECURITIES ) <br> AND EXCHANGE COMMISSION, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> STEPHEN G. DONAHUE and ) <br> DONAHUE SECURITIES, INC., ) <br> ) <br> Defendants. ) <br> _____) | CASE NO. 1:01-cv-116 <br><br> Judge Sandra S. Beckwith |

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM IN SUPPORT OF ITS MOTION TO SET AMOUNT OF DISGORGEMENT, DISTRIBUTE RECEIVERSHIP ASSETS AND DISMISS CERTAIN CLAIMS**

The Securities and Exchange Commission ("Commission"), by its attorneys, submits this memorandum in support of its Motion to Set Amount of Disgorgement, Distribute Receivership Assets and Dismiss Certain Claims. As explained below, the Court-appointed Securities Investor Protection Corporation ("SIPC") Trustee and Receiver have marshaled all of Defendant Stephen G. Donahue's ("Donahue") personal assets and the assets of his companies, Donahue Securities, Inc. ("DSI") and SG Donahue and Company, Inc. ("SG Donahue") and determined the amount by which Donahue was unjustly enriched as a result of the fraudulent scheme. Based on the analysis conducted by the SIPC Trustee and the Receiver, the Commission requests that the Court set the amount of Donahue's disgorgement, find that the amounts already collected by the Receiver and the SIPC Trustee fully satisfy Donahue's disgorgement obligation and authorize the Receiver to distribute the funds held in his client trust account *pro rata*

1

between SIPC and the remaining unpaid investors. The Commission also requests that the Court dismiss its claim for civil penalties against Donahue. Because the SIPC Trustee has ceased all of DSI's business operations, liquidated DSI's assets and withdrawn DSI's registration with the Commission as a broker-dealer, the Commission further requests that the Court dismiss its claims for a permanent injunction, disgorgement and civil penalties against DSI.

## STATEMENT OF FACTS

**A.    Procedural Background**

The Commission instituted this action on February 26, 2001 by filing a Complaint seeking a temporary restraining order, orders of preliminary and permanent injunction and other relief against Donahue and DSI for violating and/or aiding and abetting violations of Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §77(q)(a)], Sections 10(b) and 15(c) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §78j(b) and 78o(c)] and Rules 10b-5 and 15cl-2 thereunder [17 C.F.R. §240.10b-5 and §240.15c1-2]. The Commission's Complaint alleged that between 1989 and the date of filing, Donahue raised through fraud approximately $6 million from 200 to 250 of Donahue and DSI's brokerage customers.[1] Among other things, the Complaint alleged that Donahue falsely represented to investors that he would invest the investors' money in a DSI money market fund, and later in the scheme, a DSI tax free bond fund, both of which purportedly would pay interest ranging from 5% to 6%. However, neither of the funds existed and Donahue never invested the investors' money. Instead, Donahue

---

[1] The Commission estimated the amount that Donahue raised through fraud and the number of injured investors described in the Complaint based on Donahue's recollection and a preliminary review of Donahue's records. The SIPC Trustee and the Receiver determined the exact figures set forth in this Memorandum based on their extensive review of Donahue and DSI's records and claims made by investors.

2

deposited the funds into at least one bank account that he controlled. Donahue then used the investors' money for personal expenses, including paying his personal taxes, renovating a condominium in Florida, purchasing a vacant lot upon which he intended to build a house, purchasing building materials for that house and opening a brokerage account and purchasing mutual funds in Donahue's name. Donahue also used the investors' money to pay business expenses of DSI and SG Donahue. The Complaint alleged that Donahue attempted to conceal his scheme to defraud investors by, among other things: using new investors' money to pay some investors principal and interest on the money they had invested; drafting and sending false account statements to the investors; altering and hiding records; and lying to examiners from the Commission's Broker-Dealer Examinations Branch.

On February 26, 2001, the Court entered an Order of Permanent Injunction against Donahue, by his consent, enjoining him from violating Section 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder and aiding and abetting violations of Section 15(c) of the Exchange Act and Rule 15c1-2 thereunder. The Court also entered an Order of Preliminary Injunction against DSI, by its consent, enjoining DSI from violating Section 17(a) of the Securities Act, Sections 10(b) and 15(c) of the Exchange Act and Rules 10b-5 and 15c1-2 thereunder. The Court's Orders also froze Donahue and DSI's assets, including the assets of SG Donahue, ordered the appointment of a Receiver over the assets of Donahue and SG Donahue and required Donahue to disgorge his ill-gotten gains and pay a civil penalty in amounts to be determined by the Court at a later hearing.

Also on February 26, 2001, due to the filing of the Commission's Complaint and in cooperation with the Commission, SIPC filed a related action against DSI under the Securities Investor Protection Act ("SIPA") seeking an Order to Show Cause why DSI should not be placed in SIPC liquidation. [SIPC v. Donahue Securities, Inc., Case No. 1:01-cv-117]. Pursuant to DSI's consent, the Court entered an Order providing for the appointment of a SIPC Trustee over DSI and staying the SIPC liquidation until March 6, 2001 to allow DSI time to locate a buyer for DSI's assets. Since DSI did not locate a buyer, on March 6, 2001, the Court appointed Douglas S. Tripp, Esq. as the SIPC Trustee over DSI on March 6, 2001.[2] Upon his appointment, the SIPC Trustee immediately began liquidating DSI through the U.S. Bankruptcy Court for the Southern District of Ohio. [In re Donahue Securities, Inc. and SG Donahue & Company, Inc., Debtors, Case No. 1:01-ap-1027]. Also on March 6, 2001, the Court appointed Michael R. Barrett, Esq. as the Receiver over Donahue and SG Donahue. On October 13, 2001, this Court and the Bankruptcy Court approved the Receiver and SIPC Trustee's motions to consolidate the estates of SG Donahue and DSI under the control of the SIPC Trustee in the Bankruptcy Court. On July 19, 2001, the Commission issued an administrative order barring Donahue from association with any broker, dealer or investment adviser based on the imposition of a permanent injunction against him. See July 19, 2001 Commission Order attached as Exhibit 1.

In June 2003, the U.S. District Court for the Southern District of Ohio criminally convicted Donahue for fraud and deceit by an investment advisor. The Court sentenced Donahue to 46 months in prison, 3 years probation and 500 hours of community service.

---

[2] On May 16, 2002, the Bankruptcy Court entered an order substituting Douglas L. Lutz as the new SIPC trustee.

4

The Court also fined Donahue $5,000.[3] Donahue is scheduled to be released from prison in January 2007.

**B.    Steps Taken By The Receiver And The SIPC Trustee To Marshall Donahue And DSI's Assets**

After the date of their appointments, the Receiver and the SIPC Trustee began marshaling all of Donahue and DSI's assets. The Receiver concentrated his efforts on examining Donahue's personal records and liquidating Donahue's personal assets. The SIPC Trustee concentrated on liquidating DSI and reviewing DSI's books, records and accounts. Among other things, the Receiver sold several side businesses operated by Donahue, including Donahue's income tax preparation business and two businesses that offered employee cafeteria plans and insurance plans to local companies. The Receiver also began negotiating the sale of Donahue's personal assets, including Donahue's Florida condominium, vacant property and building materials. Through the liquidation of Donahue's personal assets, the Receiver collected approximately $1,427,959. After settling with certain of Donahue's lien-holders and collecting his and his counsel's Court-approved fees, the Receiver currently holds approximately $927,275 in his trust account.[4] The Receiver is confident that he has located and liquidated all of Donahue's personal assets.

After his appointment, the SIPC Trustee ceased DSI's operations and began negotiating the sale of DSI's financial and physical assets. The SIPC Trustee collected $3,448,808.37 through liquidating DSI and an additional $193,075 through the Receiver's liquidation of SG Donahue for a total of $3,641,883.37. In March 2004, the

---

[3] As of the date of this filing, Donahue has not paid the $5,000 fine ordered by the Court in the criminal action.
[4] The Receiver estimates that his and his counsel's remaining fees and expenses may total around $15,500.

5

SIPC Trustee also filed a Form BD-W with the Commission seeking to withdraw DSI's registration as a broker-dealer with the Commission. DSI's withdrawal from registration became effective in May 2004.

As part of his duties, the SIPC Trustee also hired accountants to perform a forensic audit of DSI's books and records and hired independent contractors to review DSI's client files and to establish a process for the submission and review of claims, including those made by investors in the fictitious DSI tax free bond fund. Through this process, the SIPC Trustee is confident that he has located and liquidated all of DSI and SG Donahue's assets. The results of this audit and the claims review process also provide the basis for the Commission's calculation of the amount by which Donahue was unjustly enriched as a result of his fraud. Based on the audit and claims review, the SIPC Trustee determined that over approximately 11 years, investors invested more than $10 million in the fictitious tax free bond fund. After deducting the amounts returned to investors in both principal and interest prior to the filing of the Commission's Complaint, SIPC determined that as of the commencement of this action, Donahue owed 133 investors $4,894,108.77. See Affidavit of Terry D. Browne, attached as Exhibit 2 and Exhibit A thereto. According to the SIPC Trustee, 50 of the 133 investors had valid "cash" claims that qualified for protection under SIPA.[5] See Exhibit 2 ¶9. The SIPC trustee determined that other investor claims, including claims made by 64 investors based on Donahue's promise to repay early withdrawal fees ("surrender charges"), did not qualify for protection under SIPA because they were not valid "cash" claims under SIPA. See Exhibit 2 ¶¶6-9.

---

[5] According to SIPC, only those investors who made "cash" investments with Donahue qualified for reimbursement of their claims under SIPA Section 78lll(2). 15 U.S.C. §78lll(2).

6

During 2002 and 2003, SIPC paid 100 cents on the dollar to the 50 investors with claims for cash investments for a total of $4,113,443.70. SIPC did not repay any of the claims of investors based on Donahue's promise to repay surrender charges. Instead, the SIPC Trustee, on behalf of SIPC, sued certain of the injured investors who received repayments of surrender charges and/or interest prior to the commencement of the Commission's action for "false profits" and collected approximately $371,396.00 from these lawsuits.

In January 2003, the SIPC Trustee obtained a $7 million default judgment against Donahue for repayment of SIPC's expenses and the money SIPC expended to pay investor claims. The SIPC Trustee, on behalf of SIPC, has claimed on several occasions, including in filings with the Bankruptcy Court, that SIPC is entitled to all funds held by the Receiver in this action because SIPC is "the only unpaid creditor of Mr. Donahue entitled to a distribution" as a result of its judgment and its repayment of the claims for "cash investments" by investors in the fictitious DSI tax-free bond fund. While the Commission disagrees with SIPC's position, the Commission also recognizes that if the funds held by the Receiver were located in the SIPC liquidation proceeding, SIPC would argue that it is entitled to priority for its administrative expenses over any investor fraud claims under SIPA Section 78fff(e). 15 U.S.C. §78fff(e). Thus, as a compromise with SIPC, the Commission recommends that the Court order the funds held by the Receiver, after payment of the Receiver's remaining fees and expenses, to be distributed *pro rata* between SIPC (for the difference between the money SIPC collected from Donahue and DSI and the money SIPC paid to investors) and those investors whose claims for repayment of surrender charges were denied by SIPC.

# ARGUMENT

### A.  Amount Of Disgorgement Sought Against Donahue

It is well established that the securities laws confer general equity powers upon the district courts. See SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2d Cir.), cert. denied, 404 U.S. 1005 (1971). "Once the equity jurisdiction of the district court has been properly invoked by a showing of a securities law violation, the court possesses the necessary powers to fashion an appropriate remedy." SEC v. Manor Nursing Centers, Inc., 458 F. 2d 1082, 1103 (2d Cir. 1972). One such remedy is an order of disgorgement against a defendant. See SEC v. Midwest Investments, Inc., 1996 WL 229783, at *7 (6th Cir. 1996); SEC v. Blavin, 760 F.2d 706, 713 (6th Cir. 1985); SEC v. Washington County Utility District, 676 F.2d 218, 227 (6th Cir. 1982). Disgorgement is an appropriate method of "depriv[ing] a wrongdoer of his unjust enrichment and . . . deter[ing] others from violating the securities laws." SEC v. First City Fin. Corp., Ltd., 890 F.2d 1215, 1230 (D.C. Cir. 1989). The Court previously found that the payment of disgorgement was appropriate in this matter in its Order of Permanent Injunction entered on February 26, 2001, entered pursuant to Donahue's consent. In the Order of Permanent Injunction, the Court ordered Donahue to disgorge all "ill-gotten gains received by [him] as a result of the conduct alleged in the Commission's Complaint" and stated that it would set the specific amount of disgorgement in a separate hearing. The Court further found that the hearing would be limited to determining the amount of disgorgement to be ordered and that Donahue would be precluded from denying that he violated the federal securities laws.

Disgorgement in Commission actions is designed to further the public interest by requiring a defendant to forfeit the amount by which he was unjustly enriched. See Blavin,

760 F.2d at 713. In other words, "when addressing the amount of money that a defendant must disgorge, the Sixth Circuit has held . . . that the entire amount of profits which were illicitly received must be disgorged." SEC v. Great Lakes Equities Co., 775 F. Supp. 211, 214 (E.D. Mich. 1991); see also Blavin, 557 F. Supp. 1304 (E.D. Mich. 1983), aff'd, 760 F.3d 706 (6th Cir. 1985); SEC v. Washington County Utility District, 676 F.2d at 227. In order to calculate the appropriate amount for disgorgement, "all doubts concerning the determination of disgorgement 'are to be resolved against the defrauding party.'" SEC v. Great Lakes Equities Co., 775 F. Supp. at 214 (citing SEC v. First City Financial, Ltd., 688 F. Supp. 705, 727 (D.D.C. 1988), aff'd, 890 F. 2d 1215 (D.C.C. 1989)). Courts have also determined that the Commission is only required to show that the amount of disgorgement is a "'reasonable approximation of profits casually connected to the violation.'" Id. (citing SEC v. First City Financial, Ltd., 890 F.2d at 1231); see also SEC v. Kenton Capital, Ltd., 69 F. Supp.2d at 15. "[S]ince calculating disgorgement may at times be a near-impossible task, the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty." Id.; see also SEC v. Lorin, et. al, 76 F.3d 458, 462 (2d Cir. 1996); SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995); SEC v. First City Financial, Ltd., 890 F.2d at 1232.

Donahue was unjustly enriched by his fraudulent scheme in two ways: 1) through investor's deposits of cash directly into the fictitious DSI tax free bond fund; and 2) through Donahue's "payment" of surrender charges into fictitious DSI tax free bond fund accounts for investors that Donahue induced to prematurely withdraw funds from legitimate investments in order to move the funds into other investments recommended by Donahue.

We calculated Donahue's unjust enrichment from cash investments by subtracting the amounts Donahue paid to investors prior to the commencement of this action through redemptions and adding up the deposits made by investors into the fictitious DSI tax free bond fund. These cash investments totaled $4,113,443.70.

We calculated the amount of Donahue's unjust enrichment through his promises to repay surrender charges by calculating the amounts of surrender charge "repayments" Donahue promised to deposit into the fictitious DSI tax free bond fund on behalf of investors who incurred early withdrawal fees for prematurely withdrawing their money from legitimate investments at Donahue's urging. Donahue "repaid" these investors for the surrender charges they incurred by creating fictitious DSI tax free bond fund accounts for them and telling them that they would earn interest of 5% to 6% on their "accounts." Donahue then provided the investors with periodic account statements showing the amount of money in their fictitious DSI tax free bond fund accounts and the accumulated interest. This exercise served to make the DSI tax free bond fund appear to be a legitimate fund. In reality, however, none of the surrender charges were ever repaid or placed in any type of fund. Of the 133 investors who invested in the DSI tax free bond fund, 64 investors had accounts containing surrender charges in amounts ranging between approximately $82 and $39,700 for a total of $780,665.07. See Exhibit A attached to Exhibit 2. Many investors' accounts contained both surrender charges and cash investments in the fictitious DSI tax free bond fund. See id. Since Donahue undertook a personal obligation to repay these surrender charges and met this obligation by making "investments" in the fictitious DSI tax free bond fund, the relief of Donahue's debt constitutes an ill-gotten gain. Thus, the total amount of Donahue's disgorgement should

10

be $4,894,108.77 which is the amount of cash investments into the DSI tax free bond fund plus the amount of surrender charges Donahue promised to repay. As discussed above, the Commission's calculation of the proper amount of disgorgement to be assessed against Donahue is based on the work of the forensic accountants and consultants hired by the SIPC Trustee to review all of DSI's records and the customer claims related to the conduct in this matter. These records are summarized in the Affidavit of Terry Browne attached as Exhibit 2.

**B.     Distribution Of The Receivership Assets**

The Commission recommends that the Court authorize the Receiver to distribute the assets remaining in the Receiver's trust account, after payment of the Receiver's remaining fees and expenses, *pro rata* to: SIPC to compensate it for a portion of its expenses arising out of its efforts to reimburse investors in this matter; and 2) those investors for whom Donahue created fictitious DSI tax free bond fund accounts to repay the surrender charges they incurred for switching out of legitimate investments and who were not compensated for their losses by SIPC.

During 2001 through 2003, SIPC made claims determinations for investors in the fictitious DSI tax free bond fund and, in 2003, paid $4,113,443.70 to 50 investors for their investments of "cash" into the DSI tax free bond fund. SIPC did not pay any of the investors with claims for repayment of surrender charges because SIPC determined that the surrender charges did not qualify as "cash" investments under SIPA. In addition, SIPC filed adversary complaints seeking repayment of "false profits" against certain investors who received payments from Donahue prior to the commencement of this action for the liquidation of their DSI tax free bond fund accounts containing surrender

11

charges. Since SIPC already has repaid investors who made "cash" investments in the fictitious DSI tax free bond fund, and did not pay any of the investors whose claims involved Donahue's promise to repay surrender charges, the Commission requests that the Court order the money held in the Receiver's trust account to be split *pro rata* between SIPC (based on the shortfall between the money SIPC collected from DSI and SG Donahue and the money SIPC paid to investors for a total of $471,560.33) and the investors who have outstanding claims for repayment of their promised surrender charges ($780,665.07 total). Based on this calculation, the remaining unpaid investors would receive approximately $570,228 and SIPC would receive approximately $344,446 of the money in the Receiver's trust account, after payment of the Receiver's remaining fees and expenses. SIPC has further agreed that if it recovers more than the amount of its $7 million judgment against Donahue through other pending or proposed litigation in the bankruptcy proceeding, SIPC will distribute back to investors any money that it receives through the distribution in this case. See November 3, 2004 Letter attached as Exhibit 3.

**C.    Dismissal Of Claim For Civil Penalties Against Donahue**

The Commission requests that the Court dismiss the Commission's claim for civil penalties against Donahue under Section 21(d)(3) of the Securities Exchange Act of 1934. [15 U.S.C. §78u(d)(3)]. Congress enacted Section 21(d)(3) "to achieve the dual goals of punishment of the individual violator and deterrence of future violations." SEC v. Kenton Capital, Ltd., 69 F.Supp.2d 1, 17 (D.D.C. 1998) (citing SEC v. Moran, 944 F.Supp. 286, 296 (S.D.N.Y. 1996)). Here, the criminal penalties already leveled against Donahue for the same conduct at issue in this matter are a sufficient deterrent from future violations of the securities laws. These criminal penalties were imposed after this Court determined

12

that the imposition of civil penalties against Donahue were appropriate in this matter. In addition, the SIPC Trustee and the Receiver have intensely scrutinized Donahue's finances and have marshaled all of Donahue and the Donahue companies' assets. Accordingly, it is clear that Donahue does not have any other assets available with which to pay civil penalties. Further, in July 2001, the Commission issued an order barring Donahue from association with any broker, dealer, or investment advisor that has prevented Donahue from practicing in his field. See Exhibit 1. This bar severely limited Donahue's ability to earn any money prior to his incarceration. In fact, Donahue has not even paid the $5,000 fine ordered against him in the criminal proceeding. Donahue will be serving his criminal sentence until January 2007 and therefore, does not currently and will not in the near future have any ability to pay a judgment of civil penalties. Moreover, even after Donahue finishes his sentence, SIPC has a $7 million judgment against him. As a result, the Commission does not believe it is in the public interest to continue to pursue its claim for civil penalties against Donahue.

**D.     Dismissal Of Remaining Charges Against DSI**

On March 6, 2001, by Order of this Court, SIPC removed its case against DSI to the Bankruptcy Court for the Southern District of Ohio. At that time, SIPC ceased DSI's operations, fired its employees and began liquidating all of DSI's assets. SIPC obtained approximately $3.4 million through its liquidation of DSI's assets. On March 10, 2004, SIPC filed a Form BD-W with the Commission seeking to withdraw DSI's registration as a broker-dealer. DSI's withdrawal from registration became effective in May 2004. Since DSI has ceased all operations, is no longer registered as a broker-dealer and has no assets, the Commission believes it is no longer in the public interest to continue to pursue

13

its claims against DSI in this matter. Accordingly, the Commission respectfully requests that the Court dismiss all remaining charges against DSI, including the Commission's claims for an order of permanent injunction, disgorgement and civil penalties.

## CONCLUSION

For the reasons stated above, the Commission respectfully requests that the Court enter an Order: 1) requiring Defendant Donahue to pay disgorgement in the amount of $4,894,108.77; 2) finding that the amounts previously collected by the Receiver and the SIPC Trustee fully satisfy Donahue's disgorgement obligation; 3) authorizing the Receiver to distribute the funds in his trust account, after payment of his remaining fees and expenses, *pro rata* between the remaining unpaid investors and SIPC; 4) dismissing the Commission's claim for civil penalties against Defendant Donahue; and 5) dismissing all remaining claims against Defendant DSI.

Respectfully submitted,

s/ Anne C. McKinley
Anne C. McKinley, IL Bar No. 6270252
One of the Attorneys for Plaintiff
U.S. Securities and Exchange Commission
175 West Jackson Boulevard, Suite 900
Chicago, Illinois 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: August 3, 2005